22-55829, and each side has 15 minutes total. Good morning. Are you good with the podium there? Yes. This is, for those of us who are a little challenged typewise, that I want to make sure it's good.  Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Ivy Ngo, and I represent Plaintiff Appellant Jonathan Espy and the proposed class. I'd like to request five minutes for rebuttal. In this case alleging prolific self-dealing and materially misleading financials, the All that is left is scienter, and the District Court erred in not finding scienter for three reasons. First, on the OCE investment in September 2017 to pay J2 CEO Zucker, J2 Board members Kretzmer and Kresge, and J2 Executive Vice President of Corporate Strategy Lo Schitzer and their related entities to do what J2 was already doing. Zucker, as J2 CEO, was not only on both sides of the deal, but he assured investors that the deal was good for J2 because it would get exposure to other types of deals not appropriate to do within J2. There's one thing I want to clear up procedurally with you. There's a couple areas that would be helpful for me. Okay, you refer to the operative complaint as the second amended complaint. Do you consider the complaint filed by Jeffrey Garcia to be plaintiff's original complaint or is the consolidated complaint plaintiff's original complaint? So I guess stated differently, how many bites at the apple have you had here? So another firm, another plaintiff had filed the original class action, and that triggers the PSLRA's lead plaintiff process. And so Mr. Espy came in on lead plaintiff. He was appointed lead and had one consolidated complaint, and in the first motion to dismiss order the court already found, like I said, materiality, falsity, and lost causation. The district court wanted more information as to why and how. So how many times did you amend the complaint? This will be the second time, which is the operative complaint before the court. All right, so you've done it twice. So if we gave you leave to amend again, that would be your third bite at the apple, or what? Yes. Okay. So then maybe, I know you're going to talk about this, but this is an area of focus for me where I'm, my under, on the CIANTR, focusing on that. I'm having a little trouble sort of reconciling ZUCCO, or ZECCO, or however you say it, and that if you find, if a court finds that allegations are based on hearsay, do not warrant further consideration, is that really accepting the allegations as true? So I'm, when we look at these allegations, it's my understanding that the district court, you had four confidential people? Correct. And the district courts didn't, looked at them, but said, I'm not considering them because of hearsay? That's partially correct. Okay. So there's... Clarify that for me. So there's three topics of misstatements, the OCE investment, the acquisition of VDW, and the consolidated financials. So the hearsay piece comes in on former employee one, FE1, on the consolidated financials. And what the second amendment complaint alleges is that FE1 had a video call with his boss, Hameet Singh, within days, if not 24 hours, of the phone box deal being made public in October 2017, and phone box's CEO touting a price tag that was higher than what J2 had paid. This court in Lloyd v. CVB Financial Corporation found that hearsay was okay as long as it was specific in time, context, and details, and involved important communications from a CEO. The second amendment complaint meets all of those requirements. And so, in terms of harmonizing TELABs and... But we're looking at those four de novo, right? Yes. Okay. How many... Did the district court consider any of the four for say-enter? No. And the district court had different reasons for disregarding different ones. So, FE1, which was the one who had a phone conversation with his boss about the consolidated financials, was on hearsay. The district court didn't consider FE2 as well, finding that FE2's statements were outside the scope of FE2's work as the global head of HR. And the district court disregarded FE4 as a pre-class period confidential witness. But this court has found in multiple situations that they can consider a pre-class period confidential witness in the context of a holistic analysis of say-enter if that person does have personal knowledge and that person also provides information with regard to how defendants receive information. So, I think the difficulty I'm having is the specificity of what their statements say, so that there is a sort of general awareness, but that doesn't translate into say-enter. So let's look at FE1, for example, because that's the one where, I don't know, if it's the boss or the colleague says they shouldn't talk publicly about the new acquisitions, right? Yes. So, where's the say-enter from that? So the plaintiff in the Second Amendment complaint provides more context as to this conversation that FE1 has with his boss, Hamid Singh, and Mr. Singh reports directly to Zucker. And in this context, FE1 provides the timing, which is in October 2017, within days, if not 24 hours, of this phone box deal being made public. Phone box's CEO goes out and tells the world that J2 paid a price tag for phone box, which was higher than it actually was. Singh reported directly to Zucker and told FE1 to not publicly talk about phone box or any other new acquisitions, including how much was paid or how they were performing, and then reinforced that instruction by telling FE1 that not talking about new acquisitions was intentional and deliberate by J2's board, because an analyst couldn't track individual entities and had to track the consolidated entity. The inference that Zucker told his direct report, Singh, to tell FE1 to not talk about that J2 wanted to control what was said during certain periods. The instruction was... So, I mean, just as a practical business matter, and obviously we're always kind of weighing to some degree these allegations, even at the motion to dismiss stage, it just seems that not having people talk publicly about acquisitions, given the level of FE1 who's under Mr. Singh, is common sense. I guess I'm having trouble giving it a nefarious interpretation. But the instruction was not to talk about individual acquisitions at certain times, because companies do have disclosure periods. The instruction was to not talk about individual acquisitions ever, and this is knowing that the phone box CEO put out there a price tag that was higher than what J2 actually paid. And so the company knew that the public thought that this price tag was higher, and so the assumption would be they have a higher margin than what actually was the truth. They knew that what they paid phone box was less. And so the fact that J2 didn't correct in any way phone box's CEO statement about the price of the deal, in of itself supports the inference that defendants knew that investors were being misled and were okay with that. Moving on to FE2, who is related to the statements on the acquisition of VDW. VDW belonged to related party VanderWeehens, newly created shell company. J2 bought this 11-month company with no employees, with a licensing program that was just beginning that was being done outside of VanderWeehens' personal residence, $900,000, to enable his work visa. So my question there, I mean, took a while to get who's related to whom and who works in which one of these entities. Why don't you get all that down? The FE2 is not really talking about, there's no suggestion that it's the actual VDW acquisition. There is this discussion about the girlfriend and making sure that she's taken care of. But where did FE2 get the information from about the acquisition? That doesn't seem to have been conveyed in those conversations. So if you can point me to where in the record, that would be helpful. So FE2 was the former global head of HR for J2. And FE2 was physically present at meetings with Zucker and Shreechi when these discussions about how VanderWeehen was going to join the company. There could have been an option where J2 simply hired VanderWeehen and gave him $900,000 as a sign-on bonus. That would have been perfectly fine. But then if they did that, they wouldn't have been able to list the VDW acquisition on the press release listing five or six acquisitions. This is the press release that starts the class period. And thus, it gives them one additional acquisition to tout their strong acquisition machine. But it didn't appear that FE2 was really part of these conversations about VDW, actually. I mean, so it just seemed on FE2 that we were missing something in terms of what... It was sort of secondhand knowledge, it seemed to me. FE2 was sitting at the table with Zucker and Shreechi. And these are in paragraph 59. I know they're there. But then they make that person leave, right? Right. But after the fact, FE2 is the one who does the onboarding and the one who does the work visas. FE2 is not just doing internal HR. But FE2 was working with VanderWeehen on over 100 acquisitions. And so FE2 was not just limited to... I know, but that's very different than talking about the acquisition. And the fact that FE2 was specifically excluded, well, we don't know what went on then. But I'm just missing where they're talking about the VDW acquisition with FE2 present. The fact, the FE2's knowledge goes to what Shreechi and Zucker knew at the time that they signed off on this press release, disclosing the VDW acquisition for $900,000. The statement, the second amendment complaint alleges that the statement about VDW was materially misleading because VanderWeehen was a related party. And even if he was not a related party, the fact is nobody reading that press release recognized that the company being acquired was a $900,000 company that just got started, that has no record. The record also has Shreechi himself saying that... Would that qualify as materiality in a $260-plus million deal? So under the accounting rules, related party transactions must be disclosed if they're above $120,000. And so this related party transaction clears the $900,000, which is why the district court found that materiality on this statement is already met. So then the question is, how did Shreechi and how did Zucker know that this statement was misleading? It's because they were involved in these conversations with FE2. So tell me what evidence you have of scienter and tell me where it comes from and what it's dependent on in terms of admissibility. If all of the four statements, if we found them to be not admissible, is there evidence of scienter? Yes. But also, what evidence of scienter is there in each one? Tell me what your evidence of scienter is. Okay. I'm down to a minute and a half, 50, but... I'll answer the question because that's obviously the crux of the whole thing here. So on the OCE investment, the scienter comes from Zucker being on both sides of the deal, from the fact that the company knew but didn't disclose that Kretzmer, Crespi, and Loschitzer were all involved in related party entities that Orchard Investment was investing in. At the same time, and under the accounting rules, if J2 had actually invested in all these companies that OCV was investing in, they would have had to disclose them as related party transactions. So to get around that accounting rule, they gave $200 million to OCV, told OCV to go invest in whatever it was investing in, and it turned out to be a mass of related party transactions, which OCV doesn't have to disclose as a private company, but J2, if they did a direct investment in these companies, would have to be disclosed. Didn't J2 disclose the biggest related transactions? And you're focusing on the ones that are smaller, right? It seems a little bit odd. No, the disclosure was about OCV and about Zucker and Ressler's involvement, but it didn't include J2's audit committee chair, Kretzmer, who approved the entire deal for $200 million, or the other board member, Crespi, and it didn't include J2's corporate strategy, Loschitzer. But it seems a little bit odd to infer, to say there's a strong inference of scienter when they disclose some of the related transactions and maybe not all of them. It seems a little bit odd that the big ones are disclosing. But what they didn't disclose was the strategy. So Zucker specifically says, hey guys, this deal is going to be good for you. I'm going to go to OCV and become a co-managing principal of OCV, so you're going to get the same acquisition and the same money back, basically, as when I was CEO of J2. But what happened was he goes away, and then you have Shaw and Terici, who are receiving quarterly updates from OCV about how much the capital calls were, how much the manuat fees were, and what parties are being investigated. So Shaw and Terici had to have reviewed those quarterly updates before they signed off on the 10Ks, partially disclosing the transaction, and before they spoke about OCV. The assumption is either they read those updates or they didn't read the updates and recklessly disclosed. The other piece of site— May I ask one other question before we close? Yeah, go ahead. Whatever you have. I do want to look at loss causation, because we're here on a de novo review. And it did seem to me that we have a controlling case, Nectar. And if you look at these reports that are here, for example, the Citron report is basically taking a bunch of public documents, and they're saying, you know, we just did careful reading of these things. So I don't know why this case differs from Nectar, where the report in that case did not support loss causation. So the key difference in this case on loss causation from following NRA BOFI and NRA Nectar, which are the two cases on loss causation in this circuit, the Citron report and the rather than anonymous reports, and this Court has already held that putting together information in a new way that would have been different than investors going out on their own is sufficient for loss causation, which is what the district court already found. The fact that the authors in this case for the Citron report and the Hindenburg were short sellers is just one of the factors to be considered. Right, but they basically were putting together information that the public can do, and our cases don't suggest that where you've got, where all you're doing is something a market participant can do somehow pumps you up so that the report supports loss causation. Well, the fact that when the reports were disclosed, you got a 20% drop when Citron came out and then another 9% when Hindenburg came out. And Hindenburg also has confidential witnesses that they spoke to in which they found more facts to support their report as well as the Citron report. And so the bringing together of information, even if it's factual, like one piece at a time, like an individual investor should not have to go and pick out all this information to put it together to figure out whether the company's disclosures are accurate. And if I can just go back one point to the scienter I know you wanted to talk about, I didn't make yet for Shaw, was that when Shaw became CEO after Zucker left, he received a compensation package that was tied to J2 stock price. And because in 2018, nothing more was disclosed about the OCV investment, at the end of 2018, Shaw ended up receiving over $45 million in compensation for 2018. For context, Zucker, the prior year in 2017, had only received $5 million. So the inference that defendants stayed silent so that they could keep self-dealing, so that they could keep maximizing their own equity in the firm at the expense of investors, is at least as plausible as defendants' competing inference. And as Tellavs has said, in a situation where there's a tie, plaintiffs win. Okay. You're four minutes over. I'll give you a little rebuttal time after we hear from the other side. But I'll decide how much we need. Thank you. Good morning. Good morning, Your Honors. Excuse me. Matthew Close for the defendants' appellees. May it please the court. SB certainly takes issue with several aspects of J2's business. You know, its use of the SEC-recommended and GAAP-approved consolidated accounting, its decision to enter into disclosed related party transactions, and its decision to buy a nascent Dutch consultancy from a Dutch business from a consultant for $900,000. SB takes issue with all that. But none of this is securities fraud. Maybe they have an argument for mismanagement. Maybe they have an argument for, you know, this company should have different leadership. But there is no affirmative misstatement that's materially misleading that resulted, the disclosure of which resulted in the losses alleged here. And as Judge McEwen put the nail on the head, let's start with loss causation. In the well-written Nectar decision, the key there was the Plainview report both was anonymous and affirmatively disclaimed that anyone should rely on it. Now, Hindenburg is anonymous. Yes, it has a name, Hindenburg. But anyone, that's not what is, that's not sufficient to transform it from an anonymous report to a report that's authored by someone whose credibility, knowledge, information, background can be assessed by the market. So the Hindenburg report is as anonymous as the Plainview report in Nectar. The second critical thing in Nectar was that the report itself basically said, we make no warranties about accuracy. We make no warranties about completeness. And the Hindenburg report contained the exact same disclaimers as those that were found and that were dispositive in Plainview. Those were the two key elements of Plainview and the Plainview report in Nectar, and both are present here. It's true also, as Judge McEwen pointed out, that both reports here are just an amalgamation of public information, easily attainable. Counsel tries to get some lift off of the fact that, well, the stock dropped after the short seller report. That's not probative on loss causation. That just shows that some stockholders are nervous that there's a short seller attack going on. I mean, in this case, the stock price after Hindenburg zoomed well past where it was pre-Hindenburg in less than two months. So if we're going to play the stock price game, the market clearly, after waters calmed a little bit, clearly saw Hindenburg for what it was, the classic short and distort. And so I do think this case is on all fours and indistinguishable from the short seller report that we had in Nectar, the Plainview report. I think counsel would say we do have some cases that suggest that market participants shouldn't have to basically plow through with the same kind of detail that other market analysts are doing. So what is your response to that? I mean, it kind of is akin to the old discovery, pigs in a truffle argument. Right. Well, we all start with the fraud on the market presumption, the efficient market hypothesis. The entire 10B5 regime is based on the premise that publicly available information is reflected in the stock price. That's why, as far back as basic, we have these cases. So you're right, Judge McKeown, that there are cases that allude to that. But it is a very narrow path. And that pathway is shut when the short seller is anonymous and affirmatively and expressly says, do not rely on my work. So when those two elements are present, as they were in Plainview, and as, I'm sorry, Nectar, the Plainview report, it's not enough. That also was the case in Nectar, where I think the decision acknowledges, well, there may have been some hunting and gathering that took place here and some assimilation. But that's not enough when you're still dealing with a short seller report that's anonymous and disclaims affirmatively that it should be relied on. I think that's where the circuit precedent lines up after those two decisions. And they don't have anything here that's distinguishable from what we had in Nectar. So, okay, the district court didn't allow the declarations to come in of the anonymous people, right? I disagree with that. That's not correct. Okay. Well, if they all come in, let's say we let them all in and we look at it de novo, is there scienter? No. And I want to be clear about what happened here. The district court, in its order dismissing the second amended complaint, looked closely at all of the former employee statements. But then, in looking at them closely, began to observe the things that I think members of this panel have observed. Wait a minute. We've got a former head of HR. She's now saying she's excluded from certain meetings, and the plaintiff is now trying to use an HR employee to make some big leaps of faith into bad accounting, reckless M&A policy, bad business practices. And the district court said, I'm not going to give that much weight. We're getting farther afield from what looks like personal knowledge. We're getting less specific in our information. We're now just getting into a dispute over whether, should someone who's in charge of acquisitions for a company, should their compensation be based in part on deal flow, quantity? I think one or two of the former employees were like, no, that's not a good idea. That undercuts quality. Wherever you land on that spectrum, it is impossible to tether that to a materially false statement that's alleged in the complaint, and to say that one of these individual defendants knowingly made that false statement with Sienter. The district court looked at FE1, and really kind of came to a lot of the same conclusions Judge McEwen did. And the argument made here— I haven't made any conclusions yet. Observations. I apologize. Let me retract that. You have someone down in Australia whose company J2 acquired, going out and giving a press interview where he basically touts himself as the greatest founder in the history of Australia with the largest ever cash out. And as the complaint alleges, the article misstates the amount paid. The only plausible inference from that would be folks back at headquarters going, hey, everyone down in EMEA, please stop talking. I don't understand the Sienter theory here. I think actually the reason people would want to stop talking is they're giving bad information. I think I heard today for the first time some theory of a duty to disclose, or a duty to the number given was wrong. That was never alleged. That's never been argued. That's not part of the argument on appeal. So the district court looked at all of these former employees closely, but just recognized that they only go so far. Former employee 4 left the company before the class period. The court said, no, that's going to cut against the views there. And that was the one on consolidated accounting. The suggestion that that is used for malevolent purposes, where we have the financial accounting standards boards has a rule out there that says, presumptively, it's the best. I mean, it almost says, like, if you're not going to use consolidated accounting, you're on the hook and on the defense to explain why, because presumptively it should be used, and it's recognized as providing the most fair presentation of the company. So, you know, with a lower level former employee, like a financial analyst who's gone before the class period, the district court properly recognized, you're not getting much tailwind off of that. Former employee 3 offers, like, a part of the case that's really not in the case anymore. That's the one who's like, well, the company operated on paper-thin margins. What's the false statement in this case? Again, you heard it again. The issue is related party transactions. They were disclosed. Judge Lee put his finger on it. The OCV transaction is disclosed multiple times. It's attributed to the- So what about the $5 million and the $45 million that she mentioned right before she stepped down on the payment to how much the bonus was? So the new CEO got a compensation package that was fully disclosed, and in the prior years, the stock price did really well. There is no- there was no- it doesn't link back to any motive that's recognized as sufficient to establish a strong inference of stanter. I mean, the cases clearly recognize that just having a desire to see the company do well, see the company prosper, it would be good for the CEO to do well. CEO's reputation, if the company does well, the CEO does well. Cases line up unanimously that that is not a strong inference for scienter. I'd like to talk about the VDW acquisition for a second. Well, yeah. I think on that, why didn't defendants disclose that the VDW acquisition was a related party transaction and the whole thing about, you know, I'm going to quit if you don't give my- you know, do this and give my girlfriend a job. Sure. Let me first say it is not a related party transaction under the SEC rules. We've cited in our response- in our appellee's brief, and the complaint makes clear. At the time of the transaction, this person was a consultant. So right there, they're outside the related party rule. Moreover, there's a Q&A by the SEC under this rule, which we cited in our appellee's brief, which specifically says, hey, if someone is on the board of a subsidiary owned by the registrant, does that person qualify under the related party rules of the SEC? And the SEC says no, because they're not an officer or director of the registrant. So let's- I mean, it's crystal clear here that there was no obligation under the SEC rule to disclose, hey, this VDW acquisition involves someone we have a consulting relationship with. Now, there was, I think- I just want to clarify one factual point. There was a press release at the end of Q3-15 that said we closed nine transactions this quarter, listed them, VDWs on that list under the heading of intellectual property. So it wasn't five, it was nine. And it's true. So now, you know, to have omitted it may have been the one that might give rise to more of an inference of scienter than including it. So, and again, the complaint, just to make sure we're clear on this, never again since VDWs ever mentioned. So there's not any basis in this complaint for anyone to conclude, oh, VDW, that's the one that was material to the market. We never said anything again about it. We know, and it's alleged to be $900,000 against $178 million in revenue that quarter, all the hallmarks of immateriality. Your question, Judge Callahan? You know, I think as a matter of privacy- Well, on that point, though, is there some inconsistency between the district court's determinations on materiality and then with respect to that small transaction being material but not disclosing it? Because it seemed to me that the district court- Said it was material. Said that this fell, all these fell into materiality or potential material misrepresentations. So I think what you see in the court below was materiality, traditionally fact-based, there's, I'm not going to decide it, right? So I do think the district court was way too generous in sort of not wanting to weight into the question of materiality, but you have no choice when you're dealing largely with omissions, right? I don't think you can say that the way VDW was disclosed along a list of the nine transactions that were made during a quarter was materially misleading because it omitted to say it was the company affiliated with a consultant we'd been using to source M&A transactions without alleging some facts that would support that inference. And I think, frankly, if you go back to the Nectar decision, that was the first half of the Nectar decision, is you've got to give something to sort of get some lift off of materiality. But I want to say- So what do you make of South Ferry's holding that an executive's exposure to non-disclosed material misleading information is enough to warrant a finding of scienter? South Ferry and other cases like it are very different. Those are cases where there's a clear false statement, often the executive, like this court's recent decision in NVIDIA, where you're dealing with a situation where a CEO has said something that is affirmatively false. The question they may become, was that statement made with scienter? Did he or she know about it? That's when we start going into questions like core operations, access and knowledge. This is not that strand of case. There's still not a false statement here. There's some detail omissions that were no facts to support any sense of materiality. So, I mean, the best example here is obviously all the individual defendants know J2 is using consolidated accounting. They're signing SOX certifications. I mean, so it's- the question isn't whether they know certain things. I think you've got to ask first the question, what is the false statement? And in those cases, like South Ferry, like the majority holding in NVIDIA, where there's like, we find the CEO was- this statement was false when made. And then if we're going to say, was it made with scienter? People can start asking the question of, did the speaker have access to the true facts? Did the speaker know the true facts? And if the answer is yes, then they'd be start to get to a strong inference of scienter. But that's not what we're dealing with here. Because all of the statements actually are true. It's just a question here of, tell us a little bit more. We would have- it would have been gossipy to know that VDW involved, you know, an effort to potentially get a longtime partner of the employee who wanted to hire a work visa. I mean, it happens in many industries. If we cross the Bay Bridge and go to Berkeley, my alma mater, or go down the 101- I mean, this issue of finding potential employment for foreign partners and spouses is not, you know, malevolent. And the fact of the matter is, I think- read FE2's comments in the complaint. He didn't want to marry her. You know, stuff like that. I mean, I think the reason they didn't do it that way was they had respect for the privacy of an individual who they valued and wanted to bring on board and wanted- didn't really want to subject them to cattiness about why won't he marry his girlfriend kind of stuff. But anyway, none of this gets you back to a motive to defraud investors on a $900,000 transaction. I see I'm way over time. You've been generous, but I'm certainly available to answer any questions. If either of my colleagues have any questions. No, apparently we don't. Thank you. All right, Ms. Snow, I'll give you two minutes. So, give me your most horrifying case for Sienter in terms of what's the worst- give me- yeah, I mean, usually we like to think, you know, sometimes people do stuff that's really bad and that gets us up there. What's the worst thing that you got here? Right, so what we have here is FE2 where this circuit found that a CW who was at the table with the individual defendants when the conversations were going on meant that that confidential witness had personal knowledge and was speaking to what defendants knew at the time. So, defense counsel's explanation of when you consider core operations or access or anything I don't think is the right question. The right question is when these defendants were signing off on public statements to investors, did they hold facts in their hands which they knew investors would have found to be material? And the answer is yes. The consolidated financials, they knew about, yes, but they also knew about based on the individual reports they were receiving about what all the revenue and all the income that was happening and would ask like FE4, what's going on with the revenue? Why is it going up or down 5%? These are individuals who are hands-on management folks and on the OCE investment- Before we get to that, FE2 wasn't at the meeting in which VDW acquisition was discussed. Is there any allegations that FE2 would have been in that type of meeting but was excluded? The inference is that the discussion was about how to bring Van der Weyhen on and so when it was considered to be potentially and then when the discussion ended up being that it was not at the table, but the inference is at the end of the day, FE2 and defendants knew exactly what was going on with Van der Weyhen with regard to why they had to structure the deal this way. Plaintiff's inference is just as plausible as defendant's inference. And on the OCE investment, at the end of the day, J2 never disclosed that the chair of was also on the other side of the deal. That the other board member, Cressy, was also on the other side of the deal in related parties to this $200 million. And Lo Schitzer, who's a corporate executive vice president of corporate strategy at the company, was making money as CEO of other small entities relating to that Orchard investment was putting money into. So at the end of the day, the individuals here knew what was going on. They simply didn't tell investors. And that is securities fraud, because investors have a right to know materially misleading information. And in this case, defendants 100% knew it. And just quickly on loss causation, going back to... Well, you're already over the limit, and we took you over, but let me find out if... Do either of you want to hear any more? I don't. All right. We've heard enough. Okay. Okay. Thank you. All right. This matter will stand submitted. And court is in recess. All rise.
judges: McKEOWN, CALLAHAN, LEE